IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


AMIE R. MULLINS,                              )    Civil No. 09-6179-JE
                                             )
                        Plaintiff,           )    FINDINGS AND
                                             )    RECOMMENDATION
            v.                               )
                                             )
MICHAEL J. ASTRUE,                           )
Commissioner of Social Security,             )
                                             )
                        Defendant.           )
_____)

        Kathryn Tassinari
        Mark Manning
        Harder, Wells, Baron & Manning, P.C.
        474 Willamette, Suite 200
        Eugene, OR 97401

              Attorneys for Plaintiff

        Dwight C. Holton, U.S. Attorney
        Adrian L. Brown, Asst. U.S. Attorney
        1000 S.W. 3rd Avenue, Suite 600
        Portland, OR 97204-2902


FINDINGS AND RECOMMENDATION - 1

Leisa A. Wolf
Special Asst. U.S. Attorney
Office of the General Counsel-Seattle Region
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 8104-7075

       Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Amie Mullins brings this action pursuant to 42 U.S.C. § 405(g) and § 1381(c)(3) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Plaintiff seeks an Order remanding the action to the Social Security Administration (the Agency) for an award of benefits. In the alternative, plaintiff seeks an Order remanding the action to the agency for further proceedings.

For the reasons set out below, the Commissioner's decision should be reversed, and this action should be remanded to the Agency for an award of benefits.

## **Procedural Background**

In applications for DIB and SSI filed on July 29, 2004, plaintiff alleged that she had been disabled since January 15, 2004. After these applications were denied initially and upon reconsideration, plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).

On December 13, 2006, a hearing was held before ALJ William Stewart, Jr. During the hearing, plaintiff's counsel agreed that the alleged onset-of-disability date should be amended to March 19, 2004. In a decision filed on March 14, 2007, ALJ Stewart found that

plaintiff had been disabled from March 19, 2004, to January 6, 2006.  ALJ Stewart concluded that, by January 6, 2006, plaintiff's condition had improved, and that she was not disabled from January 7, 2006, through the date of his decision.

On June 26, 2009, the Appeals Council denied plaintiff's request for review of the ALJ's determination that she was no longer disabled.  With that denial, the ALJ's decision became the final decision of the Commissioner.  In the present action, plaintiff seeks judicial review of that decision.

## Factual Background

Plaintiff was born on June 24, 1960, and was 46 years old at the time of the hearing before the ALJ.  She earned a GED, and has completed some college course work.  Plaintiff has past work experience as a horse trainer, house cleaner, waitress/bar waitress, short order cook and automatic sewing machine feeder.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national

economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not

meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d

at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can

perform jobs that exist in significant numbers in the national economy.  Id.


### Medical Record

On March 11, 2004, plaintiff was hospitalized for cellulitis in the right side of her

neck, which was caused by injecting heroin.  She was diagnosed with sepsis, probable

endocarditis, and pneumonia thought to be caused by sepsis.  Plaintiff was treated, and was

released four days later.  She was readmitted the following week because of intermittent fever

and rigors, nausea, and difficulty breathing.  While in the emergency room, a right femoral

vein central line was placed after a number of unsuccessful attempts to start an IV.  Plaintiff

was diagnosed and treated for septic thrombophlebitis, and was discharged on April 9, 2004.

On April 5, 2009, Dr. Jennifer Bowman, a psychiatrist, evaluated plaintiff because

of concerns about plaintiff's "severe anxiety."  Dr. Bowman noted that plaintiff was very

guarded, demonstrated a restricted affect, and exhibited poor judgment and insight.  Plaintiff

told Dr. Bowman that she began smoking marijuana as a teenager, and began using IV heroin

when she was 35 years old.  Dr. Bowman noted that plaintiff exhibited very significant denial

concerning her drug abuse, and did not think that she needed treatment.  Dr. Bowman

diagnosed Anxiety, NOS, and Personality Disorder, NOS with cluster B traits.[1]

---

[1]Cluster B traits include Antisocial, Borderline, Histrionic, and Narcissistic Personality
Disorders.  Individuals with these disorders often appear to be dramatic, emotional, or erratic.
*Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. (DSM-IV)*, p. 629-30.

Dr. Larry Myers began treating plaintiff for chronic anxiety and acute right-knee arthritis in September, 2004.  Plaintiff's prescriptions included Klonopin, Trazadone, Methadone, Coumadin, Paxil, and Prednisone, but plaintiff could not afford most of her medications.  Dr. Myers noted that plaintiff "does manipulate to get her medications filled," and stated that it was "hard to get the truth out of her."  In a letter to the Agency dated November 8, 2004, Dr. Myers indicated that plaintiff was "not capable of doing very much" sitting, standing, walking, lifting, carrying, or handling objects.  He opined that plaintiff probably had "some permanent, chronic physical deficiencies," and had "significant mental and physical disabilities."  In a chart note dated November 16, 2004, Myers noted that plaintiff was "in pain [from] dawn to dusk and in the night, particularly in her right leg and right foot, both hips, and now her shoulders."  In an evaluation dated January 18, 2005, Dr. Myers stated that plaintiff's pain was improving, and that her fatigue would improve with conditioning.

On February 27, 2005, plaintiff was taken to an emergency room after taking too many methadone tablets.  Notes from that visit describe plaintiff as having a history of "over-medicating" and making up "stories about having her medications stolen, etc."  The emergency room notes also indicated that, as a result of her IV drug abuse, plaintiff had "developed a thrombophlebitis in her upper extremities, neck, resulting in permanent embolism" for which plaintiff was treated with Coumadin.

David Truhn, a licensed psychologist, conducted a psychological evaluation of plaintiff on March 15, 2005.  Dr. Truhn reported that plaintiff could "identify only the simplest form of abstract reasoning," and could "respond only to the simplest questions on a test of general fund of knowledge and long term memory . . . ."  He opined that plaintiff's

mental status examination "seems to indicate that she would have significant problems with general fund of knowledge and long-term memory and abstract thinking." Plaintiff reported life-long depression, and said that she had suffered from anxiety during the previous two years. She reported that crowds increased her anxiety, and that she preferred to shop at small markets and avoided major grocery stores. Plaintiff told Dr. Truhn that she could not work because she could not breathe and had tightness in her chest, and felt that she would pass out in a work environment.

Dr. Truhn diagnosed Opioid, Cannabis, and Alcohol Abuse; Panic Disorder Without Agoraphobia; Dysthymic Disorder; and Rule out Generalized Anxiety Disorder. He rated plaintiff's Global Assessment of Functioning (GAF) at 50, and recommended therapy, vocational rehabilitation, chemical dependency treatment, and medication management. Dr. Truhn stated that plaintiff's symptoms were chronic, and opined that plaintiff's prognosis was guarded. He added that abstaining from marijuana and alcohol might "help stabilize her situation."

Chart notes of a visit to Dr. Myers on April 27, 2005, indicate that plaintiff continued to experience significant pain and swelling in her foot when she was active. Dr. Myer's noted that plaintiff's right leg and foot showed "dependent rubor and almost bluish rubor . . . [s]ubtle edema . . . and [p]oor pulses." Dr. Myers diagnosed sensory neuropathy and circulatory restriction secondary to trauma experienced the previous year.

In notes of a visit on May 2, 2005, Dr. Myers indicated that plaintiff had given different, conflicting stories about the "total loss of medications." In notes of a visit on May 27, 2005, he stated that plaintiff had "suffered considerably" and was "pretty much paralyzed by the pain this month . . . ." Dr. Myers added that plaintiff seemed "very

straightforward, determined, an[d] suffering."  Plaintiff moved slowly and had a right-sided limp.  Dr. Myers opined that, though pain dominated her life, plaintiff was "holding up," and he did not "sense any addictive or diversion tendencies."  He added that plaintiff "seems to be staying clean . . . ."

Plaintiff was seen by Dr. Andrew Bourne on September 20, 2005.  Dr. Bourne stated that plaintiff had discontinued Coumadin therapy, apparently at the direction of her primary care provider, had subsequently experienced increased pain in her right foot, and had developed "an acute onset of right calf claudication . . . ."  He suspected an occlusion of plaintiff's iliofemoral obturator graft bypass, which he thought would "likely require angiography and possible graft thrombectomy or revision."  A few days later, after imaging revealed a complete thrombosis of the bypass graft, Dr. Bourne performed a graft thrombectomy and revision of the bypass grant, with good results.

In notes of a visit on October 3, 2005, Dr. Myers indicated that plaintiff's chronic anxiety had been well controlled on clonazepam, but that plaintiff needed mental health counseling as well.  In notes of a visit on October 25, 2005, Dr. Myers stated that plaintiff was crying, tearful, and discouraged because she had not been able to enter school.  Though plaintiff exhibited edema externally and around the knee, and rubor, she reported that she had good color in the leg when horizontal.

In notes from a visit on November 15, 2005, Dr. Myers indicated that plaintiff had been in tears because she had "a hard time keeping up with the pain . . . ."  Dr. Myers opined that plaintiff's chronic pain was "going to be debilitating and always present, but will improve from here."  He added that plaintiff "should be able to do a sit down job with some

intermittent standing," and indicated that he had encouraged plaintiff to seek vocational rehabilitation.

On January 7, 2006, plaintiff started taking classes at Lane Community College.  In a visit to Dr. Myers on January 31, 2006, plaintiff reported increased nausea and vomiting, and said that she was "feeling quite stressed by staying on schedule and catching up."  Dr. Myers described her as "somewhat intense," and noted that she limped.  In notes of a visit on February 28, 2006, he described her as "facing some nervous issues."  Dr. Myers noted that he had "grave concerns" about plaintiff's use of her medications, and noted his suspicion that plaintiff was not "consistent on Coumadin."

In a letter to plaintiff dated March 8, 2006, Dr. Myers stated that he was "having increasing worries about the trust in our relationship."  He expressed concern that plaintiff would not take a random urine test he requested during her last visit, and informed plaintiff that he was reducing her methadone and thought it was "time to wean" her from that medication.

In an assessment form she completed on April 18, 2006, plaintiff indicated that she experienced continuous pain in her right leg, knee, ankle and foot, and in her lower back and hips.  Records from her visit that day indicate that plaintiff's gait was "still a little shuffling," and that both her feet were cool and had poor pulses, but good capillary refill.  Plaintiff had much less flexibility and extension in her right than left forefoot, and had hypoesthesia down the inside of her right leg.

Dr. Myers' notes dated May 19, 2006, indicate that plaintiff's urine screen was positive for opiates, marijuana, and methadone.  Plaintiff reported that she vomited

frequently, and sometimes vomited up her Coumadin.  She denied using any substances other than those Dr. Myers prescribed.

On June 5, 2006, plaintiff reported weakness in her right hand, and significant pain in her cervical spine.  Dr. Gale Hacker noted that plaintiff had a "marked hand drop," and sent plaintiff to an emergency room.  There, the examining doctor noted "essentially nonexistent extension of the thumb" and a flexion and wrist drop with "minimal to no dorsal flexion" at the wrist or in all the digits.  Plaintiff was diagnosed with acute right radial nerve palsy with wrist drop.  A CT scan showed a congenital absence of two cerebral arteries.

Plaintiff continued to experience chronic pain in her right leg between July and October, 2006.  She reported increased swelling and stiffness, and increased difficulty walking.  On July 20, 2006, Dr. Myers noted that plaintiff was "still struggling with inadequate analgesia."   He noted that plaintiff was riding her bicycle regularly, and reported pain in her hips, knees, lower legs, and feet, during and after exercise.  Dependent rubor was still present.  In notes of a visit on September 18, 2006, Dr. Myers indicated that plaintiff's right leg was "pretty normal," and that plaintiff had "residual edema, which is normal for her."  Plaintiff told him that she had "no problems with riding" her bicycle.  In October, 2006, plaintiff told Dr. Myers that she needed an increase in her anxiety medication because of increased stress.  Dr. Myers indicated that plaintiff's pain seemed to be tolerable, but that plaintiff had not been taking care of herself physically.

Chart notes dated November 7, 2006, indicate that plaintiff complained of swelling, redness, and cold in her hands.  Dr. Hacker noted that plaintiff's hands were somewhat cold and red, and described plaintiff as "quite emotionally labile."  In his chart notes dated November 14, 2006, Dr. Myers stated that plaintiff was active.  She was "biking, walking,

and attending classes.  Doing well."  Plaintiff's chronic right leg pain was controlled with methadone.  Dr. Myers opined that plaintiff did not display "any addictive behaviors," and he decided not to change her medications.

On February 3, 2007, plaintiff went to an emergency room because of increasing right leg pain.  Plaintiff's iliofemoral graft was found to be again occluded, and Dr. John Dickinson performed a catheter directed thrombolysis with placement of a stent in her right external iliac artery.

On April 6, 2007, plaintiff again experienced claudication symptoms, calf pain, numbness, tingling, and color changes in her right foot.  Tests showed that plaintiff's bypass graft had again become clogged.  In a letter dated June 29, 2007, Dr. Dickinson told plaintiff that the "surgical and angiogram approaches" to the blocked bypass graft had "essentially been exhausted at this time."  He recommended that plaintiff consult with the vascular surgery staff at Oregon Health Sciences University (OHSU).

In a letter dated August 28, 2007, Dr. Gregory Moneta, Professor of Surgery at OHSU, told Dr. Myers that plaintiff's bypass graft was probably occluded, and that it might be possible to reconstruct plaintiff's occluded artery with an iliopopliterea bypass graft or a femoral to profunda femoris bypass.  He added that more testing was needed to determine what surgical approach would be most beneficial.

In his responses to a "fill in the blank" questionnaire from plaintiff's attorney dated November 20, 2007, Dr. Myers stated that he had diagnosed plaintiff with obstructive, chronic thrombophlebitis of the right leg; hepatitis C; dyspepsia; General Anxiety disorder; and tobacco addiction.  He listed skin thickening, poor arterial venous filling, rubor, edema, cool extremity, and sensitive skin as objective medical evidence for his diagnoses.  Dr. Myers

stated that plaintiff's symptoms included pain at rest and with motion, coldness, weakness, and decreased sensation, and noted that these symptoms had been progressive for six months. Dr. Myers opined that plaintiff could not perform a full range of sedentary work.  He added that plaintiff "cannot move from place to place or stand for more than a few minutes.  She has rest pain."  In response to the question whether plaintiff would "be able to sustain work activity on a full-time basis in the sedentary category considering any exacerbation of her medical condition," Dr. Myers checked the blank before "Unable to sustain sedentary work."

Plaintiff was originally scheduled for a bypass procedure at OHSU in August, 2007, but surgery was delayed because of financial problems and school.  She returned to the OHSU vascular surgery clinic in February, 2008.  By then, claudication limited her ambulation to approximately one-half block, and her activities of daily living were significantly affected.  Dr. Gregory Landry noted that plaintiff clearly had significant pain in her right leg, even at rest.  Tests indicated that plaintiff's right external iliac artery and proximal right superficial femoral artery were occluded, and that plaintiff had "extensive collateralization across the . . . arterial segments through the internal iliac artery proximally and the profunda femoral artery distally."

On February 21, 2008, Dr. Gregory Moneta performed a right aortofemoral bypass and a right femoropopliteal bypass graft.  Plaintiff was discharged from the hospital on February 25, 2008.

**Hearing Testimony**

1. Plaintiff's testimony

At the hearing held on December 16, 2006, plaintiff testified as follows:

Plaintiff's right leg became swollen every day. She had to be careful walking, and used a cane except around the house. Pain and swelling in her right leg affected her concentration. Elevating the leg helped alleviate the swelling, and, when she was home, plaintiff put the leg up "pretty much all the time." Plaintiff could not walk more than two or three blocks before pain and swelling in her right leg forced her to stop. She had not purchased the compression stocking that had been prescribed because she could not afford it.

Plaintiff was in her third term at Lane Community College (LCC), where she was taking classes to relearn how to learn. She had a GPA of 2.1, and had failed classes. Plaintiff received financial aid and medical treatment through LCC. She experienced panic and anxiety around other students and professors, and avoided or exited crowded buses because of the stress they caused her.

Plaintiff did not have a vehicle or valid driver's license, and rode a bicycle because it was easier than walking. She rode beside the curb so she could put her left foot down if she lost balance. Plaintiff suffers from headaches, and from Raynaud's syndrome, which made her fingers numb and prevented her from operating a keyboard.

2. VE's testimony

The ALJ posed for the VE a hypothetical describing an individual of plaintiff's age, experience, and education, who could lift and carry 10 pounds, walk and stand for three hours in an eight-hour work day, was not limited in sitting, should not climb ladders or use

scaffolds, was limited to occasional stair climbing, balancing, stooping, kneeling, crouching, or crawling, could not negotiate rough ground, needed to use a cane for walking, could walk two or three blocks, had moderate limitations in consistently following detailed instruction, maintaining attention and concentration for extended periods, tolerating changes in work setting, formulating work plans and goals, and interacting appropriately with the public, and could not tolerate crowds.

The VE testified that these limitations precluded performance of plaintiff's past work, but would permit an individual to work as an eye glass assembler, document preparer, or food and beverage order taker.

In response to questioning by plaintiff's attorney, the VE testified that an individual who had to elevate her right leg for 10 to 15 minutes per hour throughout the work day could not perform any of these positions.  He also testified that an individual who had a marked limitation in the ability to respond appropriately to changes in the work setting could not sustain competitive employment.


### ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act on March 19, 2004.  At the first step of his analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since that date.

At the second step, the ALJ found that plaintiff's severe impairments included:

history of right jugular vein thrombophlebitis (March 23, 2004); history of infected femoral pseudoaneurysm with numerous septic emboli (July 2004) and multiple organ failure, status-post right iliofemoral bypass grafting with prolonged recovery and chronic pain; history of traumatic injury (December 2004) with fracture at the left wrist (distal radius) and ankle injury with resulting worsening lower extremity edema (significantly improved by

February 2005); episode of occlusion of the right lower extremity bypass graft after stopping Coumadin therapy, requiring thrombectomy and revision of the bypass graft; polysubstance dependence, including heroin, marijuana, alcohol, and bensodiazepine; anxiety disorder with history of panic symptoms; dysthymia; and personality disorder (dependent) . . . .

After next finding that plaintiff had been disabled from March 19, 2004, through January 6, 2006, the ALJ found that plaintiff had experienced medical improvement as of January 7, 2006. He then repeated his sequential disability analysis for the period of January 7, 2006, through the date of his decision. At step three of the analysis, the ALJ found that, as of January 7, 2006, plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment in the "listings," 20 C.F.R. Part 404, Subpart P, Appendix 1. In evaluating plaintiff's residual functional capacity as of that date, the ALJ found that plaintiff could:

lift and carry 10 pounds, stand and/or walk two or three blocks at a time, for a total of three hours per eight-hour work day, and had no sitting limitations. She was unable to negotiate rough ground, needed to use a cane, was restricted from climbing ladders or scaffolds, and was limited to occasional climbing stairs, balancing, stooping, kneeling, crouching, and crawling. In addition, she was moderately limited in her abilities to consistently follow detailed instructions, maintain attention and concentration for extended periods, appropriately interact with the public (and unable to tolerate crowds), tolerate unexpected or rapid changes in a work setting, and independently formulate her own work plans or goals.

At the fourth step, the ALJ found that plaintiff could not perform any of her past relevant work.

At the fifth step, the ALJ found that plaintiff retained the functional capacity required to perform jobs that existed in substantial numbers in the national economy. Based upon the testimony of the VE, he cited eye glass assembler, document preparer, and food and beverage order taker positions as examples of such work. Based upon this finding, the ALJ concluded

FINDINGS AND RECOMMENDATION - 15

that plaintiff was not disabled from January 7, 2006, through March 14, 2007, the date of his

decision.

### Standard of Review

Plaintiff contends that the ALJ erred in finding that plaintiff's medical condition

had improved as of January 7, 2006.  She asserts that, because of this error, this action

should be remanded to the Agency for an award of benefits, or for reconsideration of the

"improvement" issue in light of evidence showing that plaintiff continued to suffer from

severe thombophlebitis which required two additional surgeries after the hearing.  Plaintiff

also contends that the ALJ failed to give clear and convincing reasons for concluding that she

was not wholly credible, and that the Commissioner failed to meet the burden of establishing

that she retained the ability to perform "other work" that existed in substantial numbers in the

national economy.

1. ALJ's finding that plaintiff was no longer disabled as of January 7, 2006

As noted above, the ALJ found that plaintiff had been disabled from March 19, 2004,

through January 6, 2006, but that, when she returned to school on January 7, 2006, she was

no longer disabled.

Disability benefits may only be terminated based upon substantial evidence that an

individual's medical condition, relating to the ability to work, has improved, and that the

claimant has regained the ability to engage in substantial gainful activity.  42 U.S.C. § 423(f).

A determination that an individual's medical condition has improved must be based upon

changes "in the symptoms, signs, or laboratory findings associated with [an individual's]

impairment(s)."  20 C.F.R. § 416.994a(c).  Remissions that are temporary will not support a

finding of medical improvement.  20 C.F.R. § 404.1594(c)(3)(iv).

Plaintiff contends that the ALJ erred in finding that she had experienced "medical

improvement" that rendered her no longer disabled as of January 7, 2006.  Because the

medical record does not provide substantial support for the conclusion that improvement in

plaintiff's medical condition was more than temporary, I agree.

In support of his conclusion that plaintiff was no longer disabled as of January 7,

2006, the ALJ cited Dr. Myers' chart notes from December, 2005, which indicated that

plaintiff was doing better, planned to return to school, was riding her bicycle without

problems, and was able to control her pain.  The ALJ also asserted that records of plaintiff's

hospitalization for occlusion of her iliofemoral bypass indicated that plaintiff was not

experiencing pain while at rest, and that plaintiff's physician concluded that aggressive

intervention was not needed.  The ALJ asserted that there was no evidence that any treating

or examining physician had recommended that plaintiff elevate her leg to relieve her

symptoms, and opined that compression stockings that had been recommended "could handle

any lower extremity edemna."  He also cited plaintiff's return to school as evidence that

plaintiff's condition had improved.

These assertions do not provide substantial evidence for the ALJ's conclusion that

plaintiff's impairments were no longer disabling as of January 7, 2007.  Dr. Myers' notes did

indicate some improvement in plaintiff's condition, including pain management, by

December, 2006.  However, in asserting that plaintiff's condition had improved substantially,

the ALJ ignored a much more substantial body of evidence that any improvement was limited

and transient.  In November, 2005, Dr. Myers opined that, though plaintiff's pain would

improve, it would always be present and "debilitating." Dr. Myers noted that plaintiff reported increased nausea and stress when she returned to school, and noted in February, 2006, that plaintiff was dealing with the same "nervous issues." Dr. Myers' records indicate that plaintiff reported continuous pain in April, 2006, and Dr. Myers noted poor pulses in her leg, with hypothesia. Chart notes of May, 2006, indicate that plaintiff continued to have edema in her right leg, and reported stress and frequent vomiting. Records from June, 2006, indicated that plaintiff had "marked hand drop" with minimal to no dorsal flexion capability at the wrist or in all digits, and acute nerve palsy was diagnosed. Notes from July, 2006, indicate that Dr. Myers noted "dependent rubor" in plaintiff's right leg, and that plaintiff reported inadequate pain relief. Records from July, 2006, through October, 2006, indicate that plaintiff reported chronic pain, with increased swelling, stiffness, and difficulty walking. In October, 2006, Dr. Hacker noted swelling in plaintiff's hands. In November, he noted redness and coldness in plaintiff's hands, and noted that plaintiff was "quite emotionally labile."

Records of plaintiff's hospitalization in February, 2007, do not support the ALJ's assertion that plaintiff was not experiencing pain at rest, or that plaintiff's treating physicians ultimately concluded that aggressive intervention was not needed. Instead, plaintiff went to an emergency room for treatment of increasing pain in her right leg. Plaintiff reported that the pain was much worse when she used her right leg, and that the leg was less painful when she elevated or rested the leg. Dr. Dickinson did state that "aggressive intervention" was not warranted. However, although he concluded that immediate surgery was not required, plaintiff was hospitalized 10 days later, and Dr. Dickinson operated to place a stent in the inflow right external iliac artery.

FINDINGS AND RECOMMENDATION - 18

The absence of evidence that any doctor instructed plaintiff to elevate her leg, and evidence that plaintiff was instructed to use compression stockings, do not support the ALJ's assertion that plaintiff was no longer disabled as of January 7, 2006.  Though the ALJ correctly noted that there is no record that a doctor instructed plaintiff to elevate her leg, there is no evidence that elevating the leg did not reduce swelling and provide plaintiff some pain relief.  To the contrary, in January, 2005, Dr. Bournes noted that plaintiff had significant edema in her right leg, which improved when the leg was elevated.  Likewise, in October, 2005, Dr. Myers noted that plaintiff reported that she had good color in her right leg "when horizontal," and that in February, 2007, she reported her leg improved when she elevated it.  Neither doctor expressed any doubt as to the accuracy of plaintiff's reports in this regard.  Though plaintiff was told to use compression stockings, the Commissioner has cited, and I have found, no support in the record for the ALJ's assertion that compression stockings could "handle any lower extremity edema" caused by plaintiff's vascular problems.

Plaintiff's return to school in January, 2006, does not provide substantial support for the conclusion that plaintiff's condition had improved to the point that she was no longer disabled.  Plaintiff's academic work was substantially less than full time, involved attendance of primarily remedial types of courses, and allowed plaintiff frequent opportunities to elevate her leg.  In addition, plaintiff's academic efforts were not entirely successful:  plaintiff failed some classes, and earned mediocre grades.

In addition to the absence of support for the conclusion that any improvement in plaintiff's condition before the ALJ issued his decision in March, 2007, was more than transient, the record includes substantial medical evidence supporting the conclusion that plaintiff continued to suffer from significant vascular problems after that time.  The record

FINDINGS AND RECOMMENDATION - 19

establishes that plaintiff's symptoms became more severe in April, 2007, and that tests

showed that plaintiff's bypass graft was again occluded.  The record indicates that plaintiff

was scheduled for a bypass procedure in August, 2007, but that surgery was delayed

because of issues with school and finances.  By February, 2008, plaintiff was experiencing

claudication after walking short distances and was significantly limited in her activities of

daily living.  A treating physician noted that plaintiff clearly had significant pain in her right

leg, even at rest.  Tests indicated that two arteries were occluded, and plaintiff was

hospitalized and surgery was performed.

      The Commissioner contends that this court should not consider evidence of plaintiff's

continued medical problems after March 14, 2007, the date of the ALJ's decision.  I disagree.

There is no question that, before he issued his decision, the ALJ was provided medical

records showing that plaintiff's third bypass graft operation had been performed on

February 15, 2007, after the hearing had been held.  Medical evidence submitted to the

Appeals Council after that date showed that plaintiff continued to have significant

impairments after the date of the ALJ's decision, and had undergone surgery because of

ongoing vascular problems nearly a year after the ALJ's decision.  Claimants are allowed to

submit additional evidence to the Appeals Council while review of an ALJ's decision is

pending, and the Appeals Council is instructed to consider the material if it "relates to the

period on or before the date of the administrative law judge hearing decision."  20 C.F.R.

§ 416.1470(b).  Courts may consider additional materials submitted by a claimant in support

of a request for review of an ALJ's decision.  E.g., Harman v. Apfel, 211 F.3d 1172, 1179-80

(9th Cir. 2000); Ramirez v. Shalala, 8 F.3d 1449, 1451-52 (9th Cir. 1993) (where Appeals

Council denied request for review of ALJ's decision after examining entire record, including

FINDINGS AND RECOMMENDATION - 20

new material, court would consider additional materials submitted to Appeals Council).

Here, the additional material plaintiff submitted to the Appeals Council while her request for

review was pending supported the conclusion that any improvements noted by the ALJ were

at best temporary.  That material was available for the Appeals Council's consideration, was

relevant to plaintiff's condition at the time the ALJ found she was no longer disabled, and is

now properly part of the record before this court.

The conclusion that, by January 7, 2006, plaintiff's condition had improved to the

point that she was no longer disabled was not supported by substantial evidence in the record.

Accordingly, the Commissioner's decision should be reversed, and this action should be

remanded to the Agency for an award of benefits.


2. Other issues raised by plaintiff

As noted above, plaintiff also contends that the ALJ failed to give clear and

convincing reasons for concluding that she was not wholly credible, and that the

Commissioner failed to meet the burden of establishing that she retained the ability to

perform "other work" that existed in substantial numbers in the national economy.  If the ALJ

erred in concluding that plaintiff was no longer disabled as of January 7, 2006, plaintiff is

entitled to disability benefits, and consideration of these issues in not necessary.  Because

I conclude that the ALJ erred in concluding that plaintiff had experienced medical

improvement that rendered her no longer disabled as of that date, I need not and do not reach

the remaining issues.

## **Conclusion**

A judgment should be entered reversing the decision of the Commissioner, and remanding this action to the Agency for an award of benefits.


## **Scheduling Order**

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due October 27, 2010. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 8th day of October, 2010.


/s/  John Jelderks                                    
John Jelderks
U.S. Magistrate Judge

FINDINGS AND RECOMMENDATION - 22